1
2
3
4
5
6
7
8                  **UNITED STATES DISTRICT COURT**
9               **SOUTHERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| 11   ROBERT COATS, | CASE NO. 05CV1196-J (PCL) |
| 12               Petitioner, | **ORDER:** |
| 13 | **(1) ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION;** |
| 14   v. | |
| 15   WILLIAM SULLIVAN, et al., | **(2) DENYING PETITIONER'S SECTION 2254 HABEAS CORPUS PETITION; AND** |
| 16             Respondents. | |
| 17 | **(3) DISMISSING ATTORNEY GENERAL BILL LOCKYER AS INDIVIDUAL RESPONDENT** |
| 18 | |

19
20        Before the Court is Magistrate Judge Peter C. Lewis' Report and Recommendation
21 ("R&R") advising the Court to deny Robert Coats' ("Petitioner") Petition for Writ of
22 Habeas Corpus filed pursuant to 28 U.S.C. § 2254. [Doc. No. 24.]  Petitioner generally
23 objected to the R&R in its entirety, and Petitioner also provided specific objections to
24 portions of the R&R.  [Doc. Nos. 25; 29.]  The issues presented are decided without oral
25 argument.  *See* S.D. Cal. Civ. R. 7.1.d.1 (2006).  For the reasons set forth below, this Court
26 **ADOPTS** the R&R and **DENIES** the Petition in its entirety.
27                          ***Federal Proceedings***
28        On June 9, 2005, Petitioner, a state prisoner represented by counsel, filed a Petition

1   for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. [Doc. No. 1.] On September 12,

2   2005, Petitioner filed a Supplemental Memorandum of Points and Authorities ("Pet.

3   Mem.") in support of the Petition, along with several exhibits. [Doc. Nos. 7, 9.]

4   Respondent filed an answer and lodged portions of the state court record. [Doc. Nos. 12-13,

5   23.]  Petitioner has filed a traverse. [Doc. No. 20.] On June 22, 2006, Magistrate Judge

6   Lewis issued his R&R. [Doc. No. 24.] Petitioner subsequently filed objections and

7   amended objections to the R&R.  [Doc. Nos. 25, 29.]

8

### State Proceedings

9        In an information filed in San Diego County Superior Court on September 23, 1999,

10   Petitioner and his co-defendant, Richard Bierd, were charged with assault with a deadly

11   weapon with force likely to cause great bodily injury on victim Joe Cabbil.  (Resp't

12   Lodgm't No. 1, Clerk's Tr. at 1-2.)  Petitioner alone was charged with assault with a deadly

13   weapon with force likely to cause great bodily injury on victim Chris Gibbs.  (*Id.*)  With

14   respect to both counts, the information alleged that Petitioner had personally used a deadly

15   weapon, and that he had acted in concert with another person (Bierd) to commit the

16   offenses because of the victims' race or color.[1]  The information alleged as sentencing

17   enhancements that Petitioner had three prior felony convictions that constituted "strikes"

18   within the meaning of California Penal Code § 667(b)-(i), five prior felony convictions that

    resulted in state prison terms, and two violent or serious felony prior convictions.

19        On May 1, 2000, the first day of trial, co-defendant Bierd pled guilty to assault with

20   a deadly weapon, admitted he had personally used a deadly weapon, and admitted he had

21   committed the offense because of the victim's race.  (*Id.* at 519.)  On May 15, 2000, a jury

22   found Petitioner guilty on both counts.  (*Id.* at 536-37.)  The jury found that Petitioner had

23   used a deadly weapon during the commission of the offenses, but did not find that the

24   offenses were committed because of the victims' race.  (*Id.*)  Petitioner was sentenced to 25

25   years to life in prison.  (*Id.* at 502.)

26        Petitioner appealed his conviction to the California Court of Appeal, raising Claims

27

28        [1] The prosecution amended the information at the close of its case to allege that Petitioner personally committed the crime because of the victims' race or color, instead of alleging that Petitioner committed the crime in concert with another.

1  Three, Five, and Six presented in the instant federal petition.  (Resp't Lodgm't Nos. 3-5.)

2  In an unpublished opinion, the appellate court affirmed the conviction.  (Resp't Lodgm't

3  No. 6, *People v. Coats*, No. D036722, slip op. (Cal. Ct. App. Dec. 30, 2002).)  Petitioner

4  then presented those same claims in a petition for review in the California Supreme Court.

5  (Pet. Ex. B.)  The petition for review was denied on March 19, 2003, in an order stating in

6  full, "Petition for review DENIED."  (Pet. Ex. C.)  Petitioner then filed a habeas petition in

7  the state supreme court on June 15, 2004, repeating Claim Three and raising the remaining

8  claims presented in the instant petition.  (Pet. Ex. A.)  The state habeas petition was denied

9  on June 8, 2005, in an order stating in full, "Petition for writ of habeas corpus is DENIED."

10  (Resp't Lodgm't No. 7.)

11  ### *Factual Background*

12  Victim Joe Cabbil testified in Petitioner's jury trial that on July 4, 1999, he and his

13  friend Chris Gibbs were riding their bicycles at the beach in Oceanside.  (Resp't Lodgm't

14  No. 2, Rep's Tr. at 131.)  Cabbil and Gibbs are both African-American.  (*Id.* at 132.)

15  Cabbil heard someone yell "white power" from inside a car that had stopped about an arm's

16  length away from him.  (*Id.* at 140-41.)  Cabbil turned toward the car and asked, "What did

17  you say?"  (*Id.* at 143.)  The front passenger then said, "White power, you fuckin' nigger."

18  (*Id*.)  Cabbil identified Petitioner in court as the driver of the car, and identified the

19  passenger as co-defendant Bierd.  (*Id.* at 148, 572, 588-90.)

20  Cabbil testified that Bierd exited the vehicle with a knife in his hand and walked

21  toward Cabbil.  (*Id.* at 147-49.)  Three more men exited the car and together with Bierd

22  attempted to surround Cabbil and Gibbs. (*Id.* at 152.)  Cabbil stepped into the street to

23  block traffic and to make sure no one could approach him from behind.  (*Id.* at 156.)  Bierd

24  took several swipes at Cabbil with the knife, missing him by about a foot.  (*Id.*)  Bierd then

25  handed the knife to Petitioner, who ran at and attempted to stab Gibbs.  (*Id.* at 156-58.)

26  Cabbil testified that he was attempting to avoid being attacked by Bierd when he

27  heard Gibbs yell "Watch out."  (*Id.* at 167-70.)  Cabbil turned around, and Petitioner

28  attempted to stab him in the head, missing by inches.  (*Id.* at 171-72.)  Cabbil heard police

sirens, and Petitioner tried to get the passengers into the car.  (*Id.* at 176.)  Petitioner

punctured tires on both bicycles, then drove off in the car.  (*Id.* at 176-77.)  Cabbil testified

that neither he nor Gibbs made any aggressive gestures during the incident.  (*Id.* at 163,

168.)

On cross-examination, Petitioner's counsel asked Cabbil whether the Oceanside

Police Department had "done any favors" for him regarding any charges that were pending

against him.  (*Id.* at 250.)  Cabbil testified that he had "[n]ever been in trouble" and that he

had no outstanding warrants.  (*Id.*)  The prosecutor then requested a sidebar regarding

defense counsel's attempt to impeach Cabbil.  (*Id.* at 251-53.)  Petitioner's counsel told the

trial judge that Cabbil had outstanding warrants in Sonoma and Vista.  (*Id.* at 252.)  The

prosecutor stated that he had told Petitioner's counsel in pretrial discovery that Cabbil had

never been convicted of a crime involving moral turpitude.  (*Id.* at 253.)  The next day, the

court held a hearing outside the presence of the jury regarding the admissibility of Cabbil's

criminal history.  (*Id.* at 255-300.)  The trial judge found no evidence that the district

attorney or the Oceanside Police Department granted Cabbil favors in exchange for his

testimony, and that it was improper for defense counsel to raise the issue before the jury.

(*Id.* at 289.)  The court found that none of the criminal charges against Cabbil were

admissible to impeach, and stated that even if they were admissible, they would be

excluded as a sanction for defense counsel's misconduct.  (*Id* at 290-93, 299-300.)  The

court instructed the jury to disregard the questions and answers regarding possible criminal

charges pending against Cabbil.  (*Id.* at 300.)

Several eyewitnesses testified at trial.  Adam Johnson testified that on the day of the

incident, he was in a condominium which overlooked the beach in Oceanside.  (*Id.* at 314.)

A car stopped and its occupants exited the vehicle.  (*Id.* at 315.)  A stocky white man from

the car squared off with the shorter of two African-American men who were near a stop

sign, while a taller white man squared off with the taller African-American man.  (*Id.* at

315.)  Johnson stated that he was surprised that the taller African-American man was

"taking so much grief" from the taller white man, because he was much bigger than the

white man.  (*Id.* at 326.)  Johnson testified that the white men were the aggressors

throughout the incident, and the African-American men made no aggressive gestures, with the exception that one threw a bottle at the car when the white men drove away after the incident.  (*Id.* at 330-31.)  Johnson did not see anyone holding a knife, but he did see a white man stab the tires of one of the bicycles.  (*Id.* at 327-28.)

Jessica MacKenzie, George Robertson, Michael Alstrom, and Angela Bryant were at a nearby park at the time of the incident.  (*Id.* at 341.)  MacKenzie testified that she saw a stocky white man chasing an African-American man and making stabbing and slashing motions at him.  (*Id.* at 345-46.)  The white man turned to walk away, but then resumed his approach with the knife when the African-American man chased after him from behind.  (*Id.* at 349.)  The white man then tried to slash a second African-American man in the back, but he turned and avoided the attack.  (*Id.* at 360.)  Before leaving the scene with his companions, the white man stabbed a tire on one of the bicycles belonging to the African-American men.  (*Id.*)

Robertson testified that he saw a white man chasing an African-American man while holding a knife, and that the white man eventually stopped chasing the African-American man and then attempted to stab a second African-American man.  (*Id.* at 386-93.)  Alstrom saw essentially the same events.  (*Id.* at 472-73.)  Bryant did not see the attack on the second African-American man, but she did see a white male attack the first African-American man and then slash a bicycle tire.  (*Id.* at 511-14.)

Jason Dobbins testified that on the day of the incident, he was working as a lifeguard and saw two white men and two African-American men involved in an altercation.  (*Id.* at 425.)  He saw the taller and heavier of the two white men give the other white man what appeared to be a knife.  (*Id.* at 427.)  As the white men were leaving, one slashed the tires on two bicycles, and one of the African-American men threw a bottle at their car.  (*Id.* at 429-30.)

John Johnston testified that he was walking up the strand on the day of the incident when he saw a car pull over to the side of the road.  (*Id.* at 434.)  Four men got out of the car and started walking toward Gibbs and Cabbil.  (*Id.*)  Johnston testified that he saw Petitioner chase Gibbs with a knife, but he never saw Petitioner make stabbing or slashing

1   motions.  (*Id.*)

2       Suzette Areyan testified that she was at the beach on the day of the incident and saw

3   a white male exit a car and approach two African-American men.  (*Id.* at 539.)  The men

4   began yelling back and forth and a white male began chasing one of the African-American

5   men.  (*Id.* at 544-46.)  When the white male returned to the vehicle, she saw him approach

6   the other African-American man and slash toward him with a knife.  (*Id.* at 547.)

7       Petitioner testified on his own behalf.  He stated that Bierd yelled "white power" at

8   Cabbil and Gibbs, and then exited the car to confront Cabbil.  (*Id.* at 894-902.)  Petitioner

9   denied knowing that Bierd had a knife, stating that he saw it only after he parked the car

10  and walked toward Bierd and Cabbil.  (*Id.* at 901, 915.)  Bierd handed Petitioner the knife,

11  and Petitioner took a few steps toward Gibbs, telling him to back off.  (*Id.* at 919-25.)

12  Petitioner stated that he took the knife because he did not want Bierd to use it, and he was

13  afraid that Bierd would be injured by Gibbs and Cabbil.  (*Id.* at 917.)  Petitioner followed

14  Gibbs for about 15 feet with the knife in order to steer him away from Bierd and Cabbil.

15  (*Id.* at 927.)  Petitioner testified that he then walked back toward Cabbil and Bierd and was

16  surprised when Cabbil approached him from behind.  (*Id.* at 951-52.)  Petitioner reacted by

17  quickly raising the knife to keep Cabbil away.  (*Id.*)  Petitioner denied trying to kill or stab

18  Cabbil.  (*Id.* at 952-53.)  He admitted slashing a tire on each of the bicycles so that the men

    would not follow him.  (*Id.* at 956.)

19                                    ***Legal Standard***

20      The duties of the district court in connection with a magistrate judge's R&R are set

21  forth in Rule 72(b) of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1).  *See*

22  Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1) (2006).  The district court must "make a de

23  novo determination of those portions of the report . . . to which objection is made," and

24  "may accept, reject, or modify, in whole or in part, the findings or recommendations made

25  by the magistrate judge."  28 U.S.C. § 636(b)(1) (2006); *see also United States v. Raddatz*,

26  447 U.S. 667, 676 (1980).  "When no objections are filed, the district court may assume the

27  correctness of the magistrate judge's findings of fact and decide the motion on the

28  applicable law."  *Johnson v. Nelson*, 142 F. Supp. 2d 1215, 1217 (S.D. Cal. 2001).  "Under

1   such circumstances, the Ninth Circuit has held that 'a failure to file objections only relieves

2   the trial court of its burden to give *de novo* review to factual findings; conclusions of law

3   must still be reviewed *de novo*.' "  *Id.* (quoting *Barilla v. Ervin*, 886 F.2d 1514, 1518 (9th

4   Cir. 1989)).  Thus, the Court conducts a *de novo* review of any findings of fact objected to

5   by Petitioner and a *de novo* review of conclusions of law.

6                      ***Petitioner's Claims and Respondent's Answer***

7           Petitioner asserts the following claims in support of his argument that his rights

8   under the Sixth and Fourteenth Amendments were violated:

9           (1) The prosecutor committed misconduct when he stated in his closing argument

10  that Petitioner had "tried to kill" victim Cabbil, because Petitioner was charged only with

11  assault and not with attempted murder.  ("Claim One")  (Attach. to Pet. at 3; Pet. Mem. at

12  15, 19-22)

13          (2) Petitioner was denied effective assistance of counsel when trial counsel: (a) did

14  not move for change of venue based on pretrial publicity; (b) did not present an adequate

15  physical description of victim Gibbs; (c) did not interview witness Colin Radach or

16  investigate his account of the incident; (d) did not object during closing argument to the

17  prosecutor's statement that Petitioner tried to kill victim Cabbil, or to the prosecutor's

18  misstatement that Petitioner stabbed Gibbs; (e) failed to preserve issues of prosecutorial

19  misconduct regarding discovery mistakes and a probable erroneous representation of

20  Cabbil's criminal history; (f) failed to claim that the prosecutor knowingly allowed Cabbil

21  to testify falsely about his criminal history; (g) failed to request an evidentiary hearing on

22  co-defendant Bierd's decision not to testify; (h) failed to move for a continuance of the trial

23  until after co-defendant Bierd had been sentenced so that Bierd could possibly testify.

     ("Claim Two")  (Attach. to Pet. at 3-4; Pet. Mem. at 15-16, 22-26.)

24          (3) Petitioner's due process rights were violated when the prosecutor failed to timely

25  disclose that charges against Cabbil would be dismissed in exchange for his testimony, and

26  failed to correct Cabbil's false testimony regarding his criminal history.  ("Claim Three")

27  (Attach. to Pet. at 4; Pet. Mem. at 16, 26-29.)

28          (4) Petitioner was denied effective assistance of counsel on appeal because, to the

extent the issues presented in this federal Petition were cognizable on direct appeal, counsel failed to raise them.  ("Claim Four")  (Attach. to Pet. at 4; Pet. Mem. at 16-17, 29-31.)

(5) Petitioner was denied due process by the prosecutor's misconduct in interfering with Petitioner's right to call a material witness, co-defendant Bierd, to testify at trial. ("Claim Five")  (Attach. to Pet. at 4; Pet. Mem. at 17, 31-39.)

(6) The trial court's imposition of evidentiary sanctions violated Petitioner's rights to present evidence and to confront and cross-examine witnesses.  ("Claim Six")  (Attach. to Pet. at 4; Pet. Mem. at 17, 39-42.)

In opposition, Respondent argues that an independent review of the record with respect to Claims One and Two, which were summarily denied by the California Supreme Court, confirms that the state supreme court's denial of these claims was not objectively unreasonable.  (Answer at 39-49.)

Respondent argues the state appellate court's adjudications of Claims Three, Five, and Six are entitled to deference, and that habeas relief is not available with respect to these claims because the state court's adjudication is neither contrary to, nor involved an unreasonable application of, clearly established United States Supreme Court precedent, and did not involve an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  (*Id.* at 12-38.)

Respondent does not address Claim Four, ineffective assistance of appellate counsel for failure to raise issues on appeal, other than to offer an observation that the claim appears to be based on Petitioner's mistaken belief that the issues were not raised below. (*Id.* at 14, n.6)

### *Discussion*

### I. Prosecutorial Misconduct

In Claim One, Petitioner argues that the prosecutor committed misconduct when he stated in his closing argument that Petitioner "tried to kill" victim Cabbil, because Petitioner was charged with only assault and not attempted murder.  (Attach to Pet. at 3; Pet. Mem. at 19.)  Petitioner also argues that the prosecutor committed misconduct when he repeatedly told the jury that Petitioner stabbed victim Gibbs, although neither victim was

injured during the assaults.  (Pet. Mem. at 19.)  In opposition, Respondent argues that an independent review of the record reveals that the state supreme court's denial of the claim was objectively reasonable because the prosecutor's remarks neither amounted to misconduct nor were prejudicial.  (Answer at 39.)

Petitioner presented Claim One to the California Supreme Court in a habeas petition, and it was not presented to any other state court.  (Pet. Ex. A at 2.)  The petition was summarily denied in an order stating, "Petition for writ of habeas corpus is DENIED."  (Resp't Lodgm't No. 7, *In re Coats*, No. S125582, slip op. (Cal. June 8, 2005).)  Where a state court decision is silent as to the rule of law or principle on which its decision is founded, a district court must conduct an independent review of the record to determine whether the state court's decision was objectively reasonable.  *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

In evaluating allegations of prosecutorial misconduct on a writ of habeas corpus, the relevant inquiry is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citations omitted).  To determine whether prosecutorial misconduct occurred, a court must examine the entire proceedings and place the prosecutor's remarks in context.  *See Greer v. Miller*, 483 U.S. 756, 765-66 (1987).  In particular, a court should consider "(1) whether the prosecutor's comments manipulated or misstated the evidence; (2) whether the trial court gave a curative instruction; and (3) the weight of the evidence against the accused."  *See Tak Sun Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir. 2005) (citing *Darden*, 477 U.S. at 181-82).  In addition, "[i]t is not misconduct for the prosecutor to argue reasonable inferences based on the record."  *See United States v. Atcheson*, 94 F.3d 1237, 1244 (9th Cir. 1996).

Here, the prosecutor stated in closing argument,

> The defendant is guilty of Count 1, the assault on Mr. Cabbil.  The defendant is guilty of assaulting Cabbil with a deadly weapon when he went over to him and tried to stab him in the back of the head.  *He tried to kill him.*  Trying to stab someone in the top of his head is at the very least an assault with a knife.  Cabbil testified to that.

(Lodgm't No. 2, Rep's Tr. at 1217-18 (emphasis added).)  Petitioner argues that the

prosecutor's statement that Petitioner "tried to kill" Cabbil constitutes misconduct because Petitioner was charged with assault with a deadly weapon, not attempted murder.  (Pet. Mem. at 19.)  According to Petitioner, the prosecutor's statement served to make the jurors feel more comfortable in rendering a guilty verdict by leading them to believe that the prosecutor had evidence that Petitioner was guilty of attempted murder, a more serious crime than the one with which he was charged.  (*Id.* at 21.)

The Court must examine the prosecutor's comment within the context of the trial proceedings to determine whether the comment infected Petitioner's trial with unfairness. *See Greer*, 483 U.S. 765-66.  Several witnesses testified that Petitioner approached Cabbil from behind and tried to stab him in the head or upper torso, but missed only because Cabbil turned around in time to avoid being stabbed.  (*See* Lodgm't No. 2, Rep.'s Tr. at 360 (MacKenzie); *id.* at 392-93 (Robertson); *id.* at 473 (Alstrom); *id.* at 546-48 (Areyan).) Given this testimony, it was not a manipulation of the evidence for the prosecutor to state that Petitioner was trying to kill Cabbil.  Because the record established that Petitioner approached Cabbil from behind and attempted to stab him in the head, the Court agrees with the R&R's finding that it was reasonable for the prosecutor to infer that Petitioner tried to kill Cabbil.  (*See* R&R at 25.)  Petitioner objects to the R&R on the grounds that "in all likelihood, the prosecutor's closing argument did come across to the jurors as assertions of personal knowledge" that Petitioner was guilty of attempted murder.  (*See* Am. Objections to R&R at 6.)  However, the prosecutor's statement was made in the broader context of establishing the elements of the crime of assault with a deadly weapon, and the prosecutor repeatedly stated that Petitioner's conduct constituted assault.  (*See generally id.* at 1217-18, 1220)  Other than the prosecutor's isolated statement that Petitioner tried to kill Cabbil, the record contains no evidence supporting Petitioner's contention that the prosecutor improperly suggested to the jury that Petitioner was also guilty of the more serious charge of attempted murder.  Finally, the weight of the evidence against Petitioner, including the eyewitness testimony described above, reduced the likelihood that the jury's decision was influenced by the prosecutor's statement.  Thus, the Court **FINDS** that the prosecutor's statement that Petitioner tried to kill Cabbil did not result in a denial of due

process to Petitioner.

Petitioner also argues that the prosecutor committed misconduct when he stated that Petitioner stabbed victim Gibbs, because Gibbs was not injured in the attack. Specifically, the prosecutor stated in closing argument, "[T]he defendant is guilty of stabbing–I'm sorry–assault with a knife," and "I submit to you, members of the jury, at the very, very minimum, you can conclude the defendant is guilty of stabbing–I'm sorry–trying to stab Gibbs." (Lodgm't No. 2, Rep's Tr. at 1222-23.) The Court examines the prosecutor's comments within the context of the trial proceedings to determine whether they infected Petitioner's trial with unfairness. *See Greer*, 483 U.S. 765-66. The prosecutor immediately corrected his statements that Petitioner stabbed Gibbs. (*See* Lodgm't No. 2, Rep's Tr. at 1222-23.) Throughout the rest of his closing argument, the prosecutor stated that Petitioner tried to stab Gibbs, rather than stating that Petitioner had, in fact, stabbed him. (*See, e.g., id.* at 1229-30.) The prosecutor also noted that it was not necessary to prove that Gibbs was injured in order to prove the elements of assault. (*Id.* at 1220-21.) Taken as a whole, the prosecutor's conduct does not amount to deception of the jury or manipulation of evidence. Given his timely correction of his misstatements, it is unlikely that the prosecutor's comments could have had the effect of misleading the jury into thinking that Petitioner stabbed Gibbs. Even if the prosecutor's conduct was improper, Petitioner cannot establish that his trial was rendered fundamentally unfair because of the misstatements. As noted above, the weight of the evidence against Petitioner was heavy and reduced the likelihood that the jury's decision was influenced by the prosecutor's misstatements. Further, the trial court instructed the jury at the end of closing arguments that "[s]tatements made by the attorneys during the trial are not evidence," making it even more unlikely that the jurors would mistakenly believe that Petitioner stabbed Gibbs. (*See id.* at 1338.) Thus, the Court **FINDS** that the prosecutor's misstatements that Petitioner stabbed Gibbs did not result in a denial of due process to Petitioner.

## II. Ineffective Assistance of Trial Counsel

### A. Legal Standard

Claims of ineffective assistance of counsel are governed by *Strickland v.*

*Washington*, 466 U.S. 668 (1984). Under *Strickland*, to prove a claim of ineffective assistance of counsel, Petitioner must meet a two-part test. First, Petitioner must show that his counsel's performance fell below an objective standard of reasonableness. *See id.* at 687. A court's review of counsel's performance should be "highly deferential" because there is a "strong presumption" that counsel rendered adequate assistance and exercised reasonable professional judgment. *United States v. Ferreira-Alameda*, 815 F.2d 1251, 1253 (9th Cir. 1986); *see also Strickland*, 466 U.S. at 690. Second, Petitioner also must show that his counsel's deficient performance prejudiced the defense. *See Strickland*, 466 U.S. at 687. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 693-94. The court need not address both the performance prong and the prejudice prong if the petitioner fails to make a sufficient showing of either one. *See id.* at 700.

### B. Application

Petitioner argues in Claim Two that he was denied effective assistance of counsel when his trial counsel: (1) did not move for change of venue based on pretrial publicity; (2) did not present an adequate physical description of victim Gibbs; (3) did not interview witness Colin Radach or investigate his version of the incident; (4) did not object during closing argument to the prosecutor's statement that Petitioner tried to kill victim Cabbil, or to the prosecutor's misstatement that Petitioner stabbed Gibbs; (5) failed to preserve issues of prosecutorial misconduct regarding discovery mistakes and a probable erroneous representation of Cabbil's criminal history; (6) failed to claim that the prosecutor knowingly allowed Cabbil to testify falsely about his criminal history; (7) failed to request an evidentiary hearing on co-defendant Bierd's decision not to testify; (8) failed to move for a continuance of the trial until after Bierd had been sentenced so that Bierd could possibly testify. ("Claim Two") (Attach. to Pet. at 3-4; Pet. Mem. at 15-16, 22-26.)

Petitioner presented Claim Two to the California Supreme Court in a habeas petition, and it was not presented to any other state court. (Pet. Ex. A at 2-3.) The petition was summarily denied by an order stating, "Petition for writ of habeas corpus is DENIED."

(Resp't Lodgm't No. 7, *In re Coats*, No. S125582, slip op. (Cal. June 8, 2005).)  Because the state court's decision is silent as to the rationale on which it is based, the Court must conduct an independent review of the record to determine whether the state court's denial of Claim Two was objectively reasonable.  *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

### 1. Change of Venue

Petitioner argues that his trial counsel was ineffective for failing to seek a change of venue based on pretrial publicity.  (Pet. Mem. at 23.)  Petitioner asserts that in media reports, he was characterized by the police as "a white supremacist skinhead," and that a newspaper columnist referred to him as a "local caricature[] of the white power movement."  (*Id.*)  In his habeas petition to the state supreme court, Petitioner included as exhibits ten newspaper articles, six of which were published within the same month as the assaults, one published three months later, one published during trial, and two published the day after Bierd's sentencing (which took place two months after Petitioner's trial ended).  (*See* Pet. Mem., Ex. A.)  Petitioner also submitted a transcript of a radio segment on hate crimes which aired several months after Petitioner's trial and included an interview with victim Cabbil.  (*See id.*)  Respondent has lodged copies of two of the same articles submitted by Petitioner. (Resp't Lodgm't No. 8.)

Respondent asserts that defense counsel did not err in failing to request a change of venue because the record does not reflect any exposure or taint in connection with the jury that decided Petitioner's guilt.  (Answer at 43.)  In support of this argument, Respondent notes that Petitioner's original jury panel was dismissed because the panel had possibly been exposed to an article about the assaults.  (*Id.*)  Respondent further argues that a transcript of the voir dire shows that defense counsel conducted thorough questioning of the jurors regarding pretrial publicity, and that the trial judge admonished the jury not to conduct any outside investigation.  (*Id.* at 43-44.)

To show that prejudicial pretrial publicity required a change of venue, a habeas petitioner must demonstrate a "reasonable likelihood that prejudicial news prior to trial . . . prevented a fair trial."  *See Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004) (citing

*Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966)).  A petitioner can demonstrate prejudice by establishing that (1) a presumption of prejudice is warranted due to massive pretrial publicity; or (2) the jurors demonstrated actual prejudice that could not be set aside.  *See Harris v. Pulley*, 885 F.2d 1354, 1363 (9th Cir. 1989).

### a. The Presumed Prejudice Standard

The Court first examines whether the pretrial media reports of Petitioner's case were so pervasive or inflammatory as to warrant a presumption of prejudice.  *See Casey*, 386 F.3d at 907.  A presumption of prejudice is warranted where "there was a 'barrage of inflammatory publicity immediately prior to trial amounting to a huge wave of public passion.' "  *See id.* (quoting *Patton v. Yount*, 467 U.S. 1025, 1033 (1984)).  Courts rarely find presumed prejudice, as it is "reserved for an extreme situation."  *See id.* at 906.  A presumption of prejudice typically does not apply where the media accounts were primarily factual and were printed several months before or after trial.  *See id*; *Ainsworth v. Calderon*, 138 F.3d 787, 795 (9th Cir. 1998).

In *Irvin v. Dowd*, the Supreme Court held that a presumption of prejudice was warranted where a "barrage of newspaper headlines, articles, cartoons and pictures was unleashed" against the defendant during the six months preceding his trial.  *See* 366 U.S. 717, 725 (1961).  The newspapers in which the stories appeared were delivered to 95% of the homes in the county in which defendant was tried, and the county's radio and TV stations carried extensive newscasts covering the case.  *Id.*  In *Sheppard,* the Supreme Court presumed prejudice where the pretrial publicity was "massive," "pervasive," and "virulent," including a broadcast three months before trial of a five-hour interview of the defendant without counsel.  384 U.S. at 354-55.  The Court noted that the publicity included many matters unfavorable to the defendant which were never presented at trial, including allegations that he had purposely impeded the murder investigation, was a perjurer, and had sexual relations with numerous women.  *Id.* at 356-57.  In *Rideau v. Louisiana*, the Supreme Court held that the defendant's trial was prejudiced by pretrial publicity where the defendant's confession to perpetrating a bank robbery, kidnaping, and murder had been repeatedly broadcast by the news media to tens of thousands of people in

the area.  373 U.S. 723, 727 (1963).

Here, the Court agrees with the R&R's finding that Petitioner has not demonstrated that the publicity surrounding his trial was so pervasive or inflammatory as to warrant a presumption of prejudice.  (*See* R&R at 28.)  Unlike the media coverage in *Irvin*, *Sheppard*, or *Rideau*, there was not a wave of publicity before Petitioner's trial.  The eleven news items Petitioner submitted were published over the span of more than a year, and three of the items were published after Petitioner's trial ended.  (*See* Pet. Mem., Ex. A.)  The Court acknowledges that four of the items were editorial in nature, rather than primarily fact-based, and the editorial writer's references to Petitioner's involvement in the white power movement were potentially inflammatory.  However, the prejudicial impact of the editorials was eroded by the fact that three of the editorials were published several months before Petitioner's trial, and one of the editorials was published after his trial ended.  (*See id.*)  Excluding the editorials, the remaining news items were primarily fact-based accounts of the assault and the related court proceedings.  (*See id.*)  The items are not remotely comparable to the inflammatory nature of the murder confession broadcast in *Rideau* or the accusations of perjury and adultery published in *Sheppard*.  Thus, the Court **FINDS** that the pretrial publicity in Petitioner's case does not warrant a presumption of prejudice

### b. The Actual Prejudice Standard

Because prejudice cannot be presumed in Petitioner's case, the Court must determine whether the jurors in his trial demonstrated actual prejudice that could not be set aside.  *See Harris*, 885 F.2d at 1363 (citing *Murphy v. Florida*, 421 U.S. 794, 800 (1975)).  The relevant inquiry "is not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant."  *Id.* at 1363 (quoting *Patton*, 467 U.S. at 1035).  A court should evaluate independently the voir dire testimony to determine whether a pattern of prejudice within the community influenced the jury.  *Lincoln v. Sunn*, 807 F.2d 805, 815 (9th Cir. 1987) (citing *Irvin*, 366 U.S. at 727).

Petitioner's first jury panel was excused after an article regarding the assaults was published in the *San Diego Union-Tribune* the morning after jury selection had begun.

(Resp't Lodgm't No. 2, Rep.'s Tr. at 100-01.)  The article stated that co-defendant Bierd had pled guilty and that Petitioner had 17 prior felony convictions.  (*Id*. at 100.)  Because the trial judge had not advised the jury panel not to read anything in the media, the parties agreed to dismiss the panel.  (*Id*.)  A new jury was selected, with the trial judge questioning prospective jurors about their exposure to any media reports regarding the case. Addressing the entire panel, the trial judge stated,

> This case, as you know, is alleged to have occurred on July 4th of 1999, so it would have been last summer on July 4th.  And it allegedly occurred at the Oceanside pier and involved two white individuals. The allegation is that they assaulted two black individuals at the Oceanside pier on July the 4th.
>
> Does that ring a bell with anyone? Does that lead you to believe that you may have seen anything in the newspaper, heard anything on the radio, seen anything on television about the case?

(Resp't Lodgm't No. 2, Rep.'s Augmented Tr. at 45-46.)  Two prospective jurors indicated that they had heard of the incident, and they were questioned by the judge and counsel outside the presence of the other prospective jurors.  (*Id.* at 53-58.)  Although both jurors stated that they remembered an incident an Oceanside involving racial tension, neither could recall the details of the incident.  (*Id.*)  Neither served on the jury, with one juror excused due to hardship and the other excused on a peremptory challenge.  (*Id.* at 104, 158.)

After asking the panel whether they had been exposed to media reports regarding the case, the trial judge then admonished them not to read media reports:

> [A]s long as you are in jury selection or if you are ultimately selected for the jury, you cannot read anything in the newspaper about this case should it appear in the newspaper or radio or television.  I know that these types of cases tend to get the media's attention and they come in to follow sometimes. It's absolutely essential you not be exposed to anything the media has to say about the case.

(*Id.* at 46-47.)

Petitioner objects to the R&R's conclusion that Petitioner was not prejudiced by counsel's failure to seek a change of venue.  (*See* Am. Objections to R&R at 7.) Specifically, Petitioner argues that the jury pool had been irreversibly tainted by the year-long media coverage of the incident, and that only a change of venue could ensure that the jurors had not been exposed to the coverage.  (*See id.*)  However, the Court agrees with the

R&R and finds that Petitioner has failed to establish that, as a result of pretrial publicity, the jurors in his trial demonstrated actual prejudice that could not be set aside. (*See* R&R at 29.) The trial court judge and counsel questioned the potential jurors regarding their exposure to media coverage of the assault, and only two potential jurors stated that they had heard about an assault in Oceanside. (*Id.* at 45-46.) Neither could remember any specific details regarding the assault. (*Id.* at 57-58.) Thus, an examination of the voir dire testimony does not show that any of the prospective jurors had "fixed opinions" about the incident, or that there was a pattern of prejudice within the community that influenced the jurors. *See Harris*, 885 F.2d at 1363. Further, the two prospective jurors who stated that they had some familiarity with the case were not seated. Finally, the trial judge took precautions to ensure that the jurors were not exposed to pretrial publicity by admonishing them to avoid exposure to media coverage of the case. (*See* Resp't Lodgm't No. 2, Rep.'s Augmented Tr. at 46-47.) Thus, the Court **FINDS** that the pretrial publicity in Petitioner's case did not result in actual prejudice to Petitioner, and that Petitioner's attorney was not ineffective for failing to request a change of venue.

### 2. Failure to Introduce Adequate Evidence of Victim Gibbs' Appearance

Petitioner asserts that his trial counsel was ineffective for failing to secure victim Gibbs' presence at trial or to otherwise introduce adequate evidence of Gibbs' physical characteristics. (Pet. Mem. at 23.) Petitioner argues that without an adequate portrayal of Gibbs' size and appearance, the jury was unable to assess the validity of Petitioner's claims of self-defense and defense of others. (*Id.*)

Respondent asserts that evidence of Gibbs' physical appearance was introduced via the testimony of victim Cabbil, who described Gibbs, and Petitioner, who testified that Gibbs was bigger than him. (Answer at 44-45.) Respondent further argues that additional evidence of Gibbs' physical characteristics would not have changed the outcome of Petitioner's self-defense claim because eight eyewitnesses testified that Petitioner assaulted both victims without provocation. (*Id.* at 45.)

A defense attorney "who fails adequately to investigate, and to introduce into evidence, [evidence] that demonstrate[s] his client's factual innocence, or that raise[s]

sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." *Hart v. Gomez*, 174 F.3d 1067, 1071 (9th Cir. 1999). Ineffective assistance of counsel claims "must be considered in light of the strength of the government's case." *Id.* at 1072. A defense attorney's failure to introduce relevant evidence is not prejudicial in a case where the evidence against the defendant is "overwhelming." *Id.*

Here, Petitioner has not shown that his counsel's failure to secure victim Gibbs' presence at trial constituted deficient performance. The Court acknowledges that Gibbs' presence at trial would have given the jury a firsthand view of the difference in stature between Gibbs and Petitioner, and thus may have supported Petitioner's testimony that he did not want to fight Gibbs and acted in self-defense. However, Petitioner's counsel did not wholly fail to introduce evidence regarding self-defense or Gibbs' physical characteristics. During direct examination, defense counsel thoroughly questioned Petitioner regarding his claim that he used the knife only to protect himself from Gibbs' advances. (Resp't Lodgm't No. 2, Rep.'s Tr. at 939-48.) Petitioner's counsel questioned Petitioner regarding Gibbs' physical characteristics, and Petitioner testified that Gibbs "could definitely take me"; that Gibbs outweighed him by 20 to 30 pounds and was four inches taller than Petitioner; and that Gibbs was quick and muscular. (*Id.* at 939.) Although Petitioner's counsel did not call witnesses to corroborate Petitioner's testimony regarding the difference in size between himself and Gibbs, several of the government's witnesses testified earlier in the trial as to Gibbs' stature. (*Id.* at 346, 437, 513.) Further, victim Cabbil testified that Gibbs was six feet two inches tall and weighed 175 pounds on the day of the incident, and this testimony was not disputed by Petitioner. (*Id.* at 132.) Perhaps most significant, Gibbs was depicted in a photograph taken on the day of the incident, and the photograph was entered into evidence and viewed by the jury. (*See id.* at 180-82, 188.) Because Petitioner's counsel made reasonable efforts to introduce evidence establishing Gibbs' physical appearance, the Court **FINDS** that Petitioner's counsel was not deficient for failing to secure Gibbs' presence at trial.

Even if Petitioner's counsel was deficient for failing to have Gibbs present at trial, Petitioner cannot establish that Gibbs' absence was prejudicial to the outcome of his case.

As noted above, sufficient evidence of Gibbs' size was presented to the jury, yet Petitioner's self-defense claim was still unsuccessful.  Given the amount of evidence submitted to the jury establishing Gibbs' size in relation to Petitioner, there is no reasonable likelihood that Petitioner would have prevailed on his self-defense claim but for counsel's failure to have Gibbs physically present at trial.  This is especially true in light of the extensive evidence showing that Petitioner did not act in self-defense, including the number of witnesses who testified that Petitioner and co-defendant Bierd were the primary aggressors in the incident.  (*See id.* at 325-26 (Johnson), 435-40 (Johnston), 471-74 (Alstrom), 511-14 (Bryant).)  Because Petitioner cannot establish that counsel's conduct was deficient or prejudicial, the Court **FINDS** that counsel was not ineffective for failing to secure Gibbs' presence at trial.

### 3. Failure to Interview Witness Radach

Petitioner claims defense counsel was ineffective because counsel "[d]id not interview or investigate witness Colin Radach."  (Pet. Mem. at 23.)  Radach was one of the men riding in the back seat of the car Petitioner was driving at the time of the incident.  (Pet. Mem., Ex. A.)  Radach stated in a police interview that he heard a bottle break behind Petitioner's car shortly after the car passed victims Cabbil and Gibbs on their bicycles, and that Petitioner then pulled the car over.  (*Id.*)  Petitioner asserts that the breaking bottle "may have explained and supported why the car stopped and why Petitioner felt he had to defend himself."  (*See id.*; Pet. Mem., Ex. A.)

Respondent argues that as a threshold matter, Petitioner has failed to prove that defense counsel did not interview Radach.  (Answer at 45.)  In the alternative, Petitioner argues that even if defense counsel did not interview Radach, there were strategic reasons not to do so, including: (1) Radach could have corroborated other testimony that the attack by Petitioner was unprovoked; (2) Petitioner did not testify that the breaking bottle caused him to pull over; (3) if Petitioner felt threatened, he could have simply driven away from the scene.  (*Id.* at 46.)  Respondent asserts that Petitioner cannot prove prejudice for these same reasons.  (*Id.*)

A defense attorney need not interview all possible witnesses to have performed

within a reasonable range of professional conduct. *See Stankewitz v. Woodford*, 365 F.3d 706, 719 (9th Cir. 2004); *Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995). "[T]he duty to investigate and prepare a defense is not limitless: it does not necessarily require that every conceivable witness be interviewed." *United States v. Tucker*, 716 F.2d 576, 584 (9th Cir. 1983). Failure to interview a witness cannot establish ineffective assistance when the person's account "is otherwise fairly known to defense counsel." *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986). When the record clearly shows that counsel was well-informed, and the petitioner fails to state what additional information would have been gained through further investigation, an ineffective assistance claim fails. *See id.* In contrast, the Ninth Circuit has found ineffective assistance where counsel refused to perform any investigation into leads directly related and of potentially great benefit to the defense. *See Sanders v. Ratelle*, 21 F.3d 1446, 1456-57 (1994); *Tucker*, 716 F.2d at 584. Ineffective assistance of counsel claims based on a duty to interview or investigate "must be considered in light of the strength of the government's case." *See Eggleston*, 798 F.2d at 376.

As a preliminary matter, the Court addresses Respondent's argument that Petitioner has failed to prove that his counsel did not interview witness Radach. Petitioner has provided a declaration from Lillian Fossa stating that the private investigator hired by his counsel did not interview Radach, and that Radach was not called as a witness because he was not interviewed. (Pet. Mem., Ex. C.) The declaration does not indicate Fossa's occupation or her relationship to Petitioner's counsel, making it impossible for the Court to assess whether Fossa's declaration is based on personal knowledge. However, the Court need not determine whether counsel did in fact interview Radach if his account of the incident was "otherwise fairly known" to counsel. *See Eggleston*, 798 F.2d at 376. The Court thus turns to the record to determine whether counsel investigated Radach's version of the events.

During a hearing in state court on Petitioner's motion for a new trial, counsel stated that he had "analyzed very carefully" the accounts of the passengers who rode in the back seat of Petitioner's car, including Radach, to determine whether they should be used in

support of Petitioner's self-defense claim.[2]  (Resp't Lodgm't No. 2, Rep.'s Tr. at 1491.)

Counsel stated that he did not call Radach and the other back-seat passenger as witnesses

because they "didn't see a lot" and "[t]old extremely conflicting stories."  (*Id.*)  The record

thus indicates that Radach's version of the events was otherwise fairly known to counsel,

and that counsel made a strategic decision not to call Radach as a witness.  The record also

shows that counsel was well-informed of the facts and circumstances surrounding the

assault.  Not only did counsel have Petitioner as a source of information, he also had access

to the many bystanders who witnessed the assault, as well as police reports.  Finally,

Radach's statement regarding the bottle was only tangentially related to Petitioner's claim

of self-defense.  Radach could not attest directly as to whether Petitioner felt that he was at

risk of imminent harm when the bottle was thrown at the car.  Unlike the cases in which the

Ninth Circuit has held that failure to interview witnesses constitutes ineffective assistance

of counsel, there is no evidence here that counsel refused to investigate leads directly

related and of potentially great benefit to Petitioner's defense.  *See Sanders*, 21 F.3d at

1456-57;  *Tucker*, 716 F.2d at 584.  Thus, the Court **FINDS** that Petitioner's counsel was

not deficient for failing to interview witness Radach.

Petitioner objects to the R&R on the grounds that his counsel's failure to interview

Radach cannot be defended as a reasonable tactical choice, and that investigation must be

"aimed at unearthing all possible facts."  (Am. Objections to R&R at 7.)  However, even if

Petitioner's counsel was deficient for failing to interview Radach, the Court agrees with the

R&R's finding that Petitioner was not prejudiced by counsel's omission.  (*See* R&R at 33.)

Viewing Petitioner's ineffective assistance of counsel claim "in light of the strength of the

government's case," there is no reasonable likelihood that Petitioner would have prevailed

on his self-defense claim but for counsel's failure to investigate and present Radach's

version of the events.  *See Eggleston*, 798 F.2d at 376.  Several witnesses testified that

Petitioner and co-defendant Bierd were the primary aggressors in the incident.  (*See* Resp't

---

[2] Petitioner's counsel brought a motion for new trial on the grounds that the prosecutor failed to disclose victim Cabbil's criminal history and dissuaded co-defendant Bierd from testifying.  These allegations of prosecutorial misconduct are examined fully in the Court's analysis of Claims Three and Five, *infra*.

Lodgm't No. 2, Rep.'s Tr. at 325-26 (Johnson), 435-40 (Johnston), 471-74 (Alstrom), 511-14 (Bryant).)  Further, Petitioner's own testimony at trial made no mention of the bottle being thrown at the car, nor did Petitioner testify that he stopped the car because he heard the bottle break.  Rather, Petitioner testified that he initially stopped the car because a van unloading passengers had blocked his path.  (*See id.* at 897.)  It was only after co-defendant Bierd exited the car and confronted victim Cabbil, and victim Gibbs came directly behind the car, that Petitioner said he became fearful and exited the car.  (*Id.* at 902.)  Thus, there is no indication Radach's statement regarding the bottle would have bolstered or even been consistent with Petitioner's testimony that he acted in self-defense.  As a result, the Court **FINDS** that counsel's alleged failure to interview Radach did not prejudice Petitioner and did not constitute ineffective assistance of counsel.

### 4. Failure to Object to Prosecutor's Closing Argument

Petitioner claims that his trial counsel was ineffective for failing to object to the prosecutor's statements in closing argument that Petitioner (a) had tried to kill Cabbil, and (b) had stabbed Gibbs.  (Pet. Mem. at 23.)  Petitioner asserts that trial counsel should have objected to prosecutor's statements because they were part of a pattern of misconduct designed to confuse, mislead, and prejudice the jury.  (*Id.* at 24.)

In opposition, Respondent asserts that there was nothing objectionable about the prosecutor's statements.  (Answer at 46.)  Respondent also argues that Petitioner cannot show prejudice because the prosecutor corrected his misstatements that Petitioner stabbed Gibbs, the statement that Petitioner tried to kill Cabbil was a reasonably drawn inference from the record, and the evidence of the assault was overwhelming.  (*Id.*)

Lack of an objection to comments made during closing argument will not support an ineffective assistance claim if the failure to object was neither professionally unreasonable nor prejudicial to the petitioner.  *See United States v. Molina*, 934 F.2d 1440, 1447-48 (9th Cir. 1991).  Failure to object may constitute a reasonable strategic decision, because "many trial lawyers refrain from objecting during closing argument to all but the most egregious misstatements by opposing counsel on the theory that the jury may construe their objections to be a sign of desperation or hyper-technicality."  *Id.* at 1448.  Even if trial counsel should

have objected to improper remarks, such failure to object does not constitute deficient representation as a matter of law.  *Id.* at 1448 n.7.  Rather, the failure to object must be considered within the "totality of the evidence."  *See Weygandt v. Ducharme*, 774 F.2d 1491, 1493 (9th Cir. 1985).  Thus, if evidence of the petitioner's guilt is overwhelming, it is not reasonably probable that the result of the trial would have been different had counsel objected.  *See id.*

As the Court has already discussed in its analysis of Claim One, the prosecutor's statements in closing argument that Petitioner tried to kill Cabbil and stabbed Gibbs did not constitute misconduct and did not infect Petitioner's trial with unfairness.  As noted above, the prosecutor's statement that Petitioner tried to kill Cabbil was a reasonable inference based on the evidence.  The prosecutor's misstatements that Petitioner stabbed Gibbs were unlikely to mislead the jury because the prosecutor immediately corrected himself after making the statements.  It follows that counsel's lack of an objection to those statements was not professionally unreasonable.  In fact, objections to the statements may have been construed by the jury "to be a sign of desperation or hyper-technicality."  *See Molina*, 934 F.2d at 1448.  In addition, there is no reasonable likelihood that but for counsel's failure to object, the outcome of Petitioner's trial would have been different.  In light of the "totality of the evidence," including the numerous eyewitness accounts establishing that Petitioner and Bierd were the primary aggressors in the incident, counsel's failure to object did not so prejudice Petitioner as to deprive him of a fair trial.  *See Weygandt*, 774 F.2d at 1493.  Thus, the Court **FINDS** that counsel's failure to object to statements in the prosecutor's closing argument did not constitute ineffective assistance of counsel.

### 5. Failure to Preserve Issues for Appeal

Petitioner claims that his trial counsel was ineffective for failing to preserve for appeal a claim that the prosecutor committed misconduct by misrepresenting victim Cabbil's criminal history.[3]  (Pet. Mem. at 24.)  Specifically, Petitioner asserts that his

---

[3] In its discussion of Petitioner's third claim, *infra*, the Court analyzes in detail whether Petitioner's due process rights were violated when the prosecutor failed to disclose Cabbil's criminal history.

counsel should have raised a claim of misconduct because the prosecutor erroneously told counsel that Cabbil had no criminal record.  (*Id.* at 4-5.)  Respondent argues that although Petitioner's trial counsel did not object specifically on grounds of prosecutorial misconduct, the California Court of Appeal still considered Petitioner's prosecutorial misconduct claim on the merits and rejected it.  (Answer at 37.)

The California Court of Appeal noted that Petitioner's trial counsel "arguably failed to preserve issues as to prosecutor misconduct."  (Lodgm't No. 6, *People v. Coats*, No. 036722, slip op. at 14 n.5.)  Nevertheless, the appellate court decided to "consider Coats's claims of misconduct post and reject them on their merits."  (*Id.*)  The appellate court found that the evidence regarding Cabbil's criminal history was not material, and that the prosecutor's failure to disclose the evidence thus did not undermine confidence in the trial's outcome.  (*Id* at 17.)

Even if Petitioner's counsel was deficient for failing to raise a prosecutorial misconduct claim at trial, Petitioner was not prejudiced by counsel's performance because the appellate court nevertheless adjudicated the claim and found that it was without merit. Despite trial counsel's failure to raise the issue, the court of appeal conducted a careful review of the trial court record and found that, regardless of any misconduct on the part of the prosecutor, Cabbil's criminal history was inadmissible for impeachment.  (*Id.* at 17.) Further, in its analysis of Claim Three, *infra*, the Court finds that Petitioner's instant prosecutorial misconduct claim is without merit because there is no reasonable probability that, but for the prosecutor's failure to disclose Cabbil's criminal history, the outcome of the proceedings would have been different. Petitioner thus cannot establish ineffective assistance of counsel because his defense was not prejudiced by counsel's failure to raise a prosecutorial misconduct claim.  *See Strickland*, 466 U.S. at 687 (holding a defendant must show both deficiency and prejudice to establish ineffective assistance of counsel). Accordingly, the Court **FINDS** that Petitioner has not established that his counsel was ineffective for failing to preserve prosecutorial misconduct issues for appeal.

### 6. Failure to Claim Prosecutor Allowed Cabbil to Testify Falsely

Petitioner argues that his trial counsel was ineffective for failing to raise a claim that

- 24 -

the prosecutor relied on false evidence.  (Pet. Mem. at 24.)  Specifically, Petitioner alleges that the prosecutor knowingly allowed victim Cabbil to testify falsely that he had no criminal history.[4]  (*Id.*)  Respondent asserts that this claim is without merit based on the same arguments Respondent raises with respect to Claim Three, *infra*, in which Petitioner argues that his due process rights were violated when the prosecutor permitted Cabbil to testify falsely.  (Answer at 37-38.)  Respondent also argues that no prejudice resulted from trial counsel's failure to raise the claim because the appellate court denied it on its merits. (*Id.* at 38.)

The California Court of Appeal acknowledged that Petitioner's trial counsel failed to raise a claim that the prosecutor knowingly permitted Cabbil to testify falsely.  (Lodgm't No. 6, *People v. Coats*, No. 036722, slip op. at 22.)  Nevertheless, the appellate court addressed and rejected the claim on the merits.  (*Id.*)  The court examined the record and found that the prosecutor did not intentionally offer false evidence because he requested a sidebar shortly after Cabbil testified that he had no warrants, and an extensive hearing was held on the matter.  (*Id.*)  The court also found that Cabbil's testimony was not material because numerous witnesses corroborated his account of the assault.  (*Id.* at 23.)  Thus, even if Petitioner's counsel was deficient for failing to raise the false evidence claim at trial, Petitioner was not prejudiced by counsel's performance because the appellate court still conducted a full review of Petitioner's allegations.  Accordingly, the Court **FINDS** that Petitioner has not established that his counsel was ineffective for failing to raise the false evidence claim.

### 7. Failure to Request an Evidentiary Hearing on Co-Defendant Bierd's Decision Not To Testify

Petitioner claims that his trial counsel was ineffective for failing to seek an evidentiary hearing on the incentives co-defendant Bierd allegedly received from the

---

[4] In its discussion of Petitioner's third claim, *infra*, the Court analyzes in detail whether Petitioner's due process rights were violated by the prosecutor's failure to correct Cabbil's testimony.

prosecution in exchange for agreeing not to testify.[5]  (Pet. Mem. at 24.)  According to Petitioner, declarations obtained after trial from his counsel's jury consultant and from Bierd show that his trial counsel "did not take every reasonable precaution to assure his client had a strong and persuasive defense."  (*Id.*)

Respondent asserts that Petitioner cannot establish that his trial counsel was deficient because counsel objected to Bierd's unavailability at trial and filed a motion for new trial on that basis.  (Answer at 47-48.)  Respondent further states that Petitioner's claim is without merit based on the same arguments Respondent asserts with respect to Claim Five, in which Petitioner argues that the prosecution interfered with his right to call Bierd as a witness.  (*Id.* at 48.)

Petitioner has not shown that counsel's failure to request an evidentiary hearing was "outside the wide range of professionally competent assistance."  *See Strickland*, 466 U.S. at 690.  An examination of the record reveals that Petitioner's counsel vigorously pursued the issue of the government's alleged interference with Bierd's testimony.  For example, Petitioner's counsel proposed a jury instruction on the matter of the prosecution's alleged willful suppression of Bierd's testimony.  (*See* Resp't Lodgm't No. 2, Rep's Tr. at 1181-82.)  The trial court rejected the proposed instruction, finding no evidence that the prosecution had made an agreement with Bierd to prevent him from testifying.  (*See id.* at 1182.)  Further, Petitioner's counsel filed a motion for a new trial on the basis that the prosecution dissuaded Bierd from testifying.  (*See id.* at 1480.)  The trial court denied counsel's motion, again finding no evidence of an agreement to prevent Bierd from testifying.  (*Id.* at 1499.)  Given counsel's efforts to raise the issue of witness interference before the trial court, the Court finds that Petitioner has failed to overcome the presumption that counsel rendered adequate assistance.  The Court thus **FINDS** that Petitioner's counsel was not ineffective for failing to seek an evidentiary hearing.

### 8. Failure to Request a Continuance

Petitioner asserts his trial counsel was ineffective for failing to request a continuance

---

[5] In its discussion of Petitioner's fifth claim, *infra*, the Court examines in detail whether the prosecution interfered with Petitioner's right to call Bierd as a witness.

1   when it became apparent that co-defendant Bierd would be unavailable as a witness due to

2   his assertion of his Fifth Amendment privilege.  (Pet. Mem. at 24.)  Petitioner alleges that

3   Bierd was the only witness who could have testified that Petitioner had the knife only

4   because he was disarming Bierd, supporting Petitioner's claim that he was using the knife

5   in self-defense when he was rushed by Cabbil and Gibbs.  (*Id.*)  Petitioner argues that if the

6   trial had been continued until after Bierd's sentencing, Bierd would have presumably been

7   available to testify.  (*Id.*)

8   Respondent asserts that this sub-part of Claim Two is unexhausted, and in the

9   alternative, that it is without merit because Petitioner has provided no evidence that a

10  continuance would have enabled Petitioner to secure Bierd's testimony, or that such

11  testimony would have changed the trial's outcome.  (Answer at 48-49.)

12  As a preliminary matter, the Court addresses Respondent's assertion that this sub-

13  part of Claim Two is unexhausted.  Petitioner states that this claim was inadvertently

14  omitted from his original federal Petition, but that it was presented in the Memorandum

15  filed in support of the federal petition, and that it was presented to the state supreme court

16  in a habeas petition and is therefore exhausted.  (Traverse at 8.)  An examination of

17  Petitioner's habeas petition to the California Supreme Court reveals that he did, in fact,

18  present this claim to the state supreme court.  (Pet. Mem., Ex. A at 3, 26.)  Thus, the Court

19  finds that this sub-part of Claim Two is exhausted and is properly before the Court.

20  The Court next turns to the merits of Petitioner's claim that his trial counsel was

21  ineffective for failing to seek a continuance.  Petitioner has not established that he was

22  prejudiced by counsel's performance because there is no reasonable probability that, but for

23  counsel's failure to seek a continuance, the result of the proceeding would have been

24  different.  *See Strickland*, 466 U.S. at 694.  Petitioner's claim "must be considered in light

25  of the strength of Respondent's case."  *See Hart v. Gomez*, 174 F.3d 1067, 1072 (9th Cir.

26  1999).  As noted previously, several witnesses testified that Petitioner and Bierd were the

27  primary aggressors in the incident and that Petitioner assaulted Cabbil with the knife.  (*See*

28  Resp't Lodgm't 2, Rep.'s Tr. at 325-26 (Johnson), 435-40 (Johnston), 471-74 (Alstrom),

511-14 (Bryant).)  Given the strength of the prosecution's case, there is no reasonable

probability that had Bierd testified, the outcome of the trial would have been different. Further, as the Court discusses in detail in its analysis of Claim Five, *infra*, Petitioner cannot establish that Bierd's testimony would have aided Petitioner's defense.  Bierd admitted at his change of plea hearing that he had assaulted Cabbil on the basis of his race, and that he had done so in concert with another person.  (*See* Resp't Lodgm't No. 2, Rep.'s Tr. at 63-70.)  The jury thus could have reasonably inferred that Petitioner was the person who aided Bierd in the assault on Cabbil, and that Bierd's testimony was unworthy of credibility.  Accordingly, the Court **FINDS** that Petitioner's counsel was not ineffective for failing to seek a continuance.

## III. Due Process

In Claim Three, Petitioner argues that his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), were violated when the prosecutor allegedly (1) did not turn over victim Cabbil's rap sheet; (2) did not timely disclose to defense counsel an alleged deal that dismissed charges against Cabbil in exchange for his testimony; and (3) failed to correct Cabbil's false testimony that he had no outstanding warrants.  (Attach. to Pet. at 4; Pet. Mem. at 16, 26-29.)  Petitioner further elaborates on Claim Three in his Traverse, alleging that the prosecutor's failure to correct Cabbil's testimony was willful.  (Traverse at 3.)  Petitioner asserts that the state appellate court erred when it ruled that Cabbil's testimony was not crucial to the prosecution's case and no due process violation occurred.  (*Id.* at 4.)  Petitioner argues that the appellate court's decision unreasonably applied federal law because Cabbil's testimony was, in fact, crucial to the prosecution's case, and evidence of Cabbil's arrests would have undermined his credibility as a witness.  (*Id.*)  In opposition, Respondent argues that the state appellate court's decision denying Petitioner's claim was not contrary to or an unreasonable application of United States Supreme Court precedent.  (Answer at 14.)

Claim Three was presented to the state supreme court in a habeas petition, and Petitioner's state petition used language nearly identical to that used in the instant federal petition.  (*Compare* Attach. to Pet. at 4 and Pet. Mem. at 16, 26-29 *with* Pet. Ex. A at 3-4, 31-35.)  The state habeas petition was summarily denied in an order stating, "Petition for

writ of habeas corpus is DENIED." (Resp't Lodgm't No. 7, *In re Coats*, No. S125582, slip op.) Claim Three was also presented to the state supreme court in a petition for review filed on direct appeal. (Pet. Ex. B at 2, 14-15.) The state supreme court summarily denied the petition for review in an order stating, "Petition for review DENIED." (Pet. Ex. C.) Because the California Supreme Court did not articulate its rationale for denying the habeas petition or the petition for review, the Court must look through the state supreme court's summary denial to a lower state court opinion adjudicating Claim Three. *See Ylst v. Nunnemaker*, 501 U.S. 797, 806 (1991). The Court thus looks to the California Court of Appeal's adjudication of Petitioner's due process claims to determine whether its denial of these claims was contrary to or an unreasonable application of clearly established federal law.

### A. Petitioner's Claim that the Prosecutor Withheld Cabbil's Rap Sheet

In his direct appeal to the California Court of Appeal, Petitioner alleged that the prosecutor violated Petitioner's due process rights by concealing Cabbil's criminal history. (Resp't Lodgm't No. 3 at 51.) In its opinion, the appellate court noted that the government acknowledged that Cabbil's criminal history should have been disclosed to the defense. (Resp't Lodgm't No. 6, *People v. Coats*, No. 036772, slip op. at 14 n.5.) Cabbil's record showed (1) an active misdemeanor bench warrant issued in 1996 for failing to appear on citations for driving on a suspended license and driving without taillights; (2) two 1991 failure to appear warrants on charges for driving with a suspended license and insufficient headlights; and (3) pending charges of misdemeanor driving under the influence and driving without liability insurance. (*Id.* at 13-14.) The appellate court found that "[t]he People rightly concede that they should have disclosed Cabbil's still pending misdemeanor charges and failures to appear." (*Id.* at 16.)

The appellate court next turned its attention to whether the suppressed evidence was material, and stated that the relevant inquiry was "had the evidence been properly disclosed to the defense, whether there is a reasonable probability of a different result." (*Id.* at 17.) The appellate court found that the trial court had soundly exercised its discretion in ruling that Cabbil's past instances of misdemeanor conduct were irrelevant to Cabbil's credibility

and therefore inadmissible for impeachment.  (*Id.* at 19.)  The appellate court also found that the trial court did not err in concluding that Cabbil's failures to appear did not demonstrate moral turpitude. (*Id.*)  Further, the appellate court determined that, in any event, Cabbil's credibility was not crucial to the prosecution's case because Cabbil's testimony that Coats slashed at him with a knife was directly corroborated by independent eyewitnesses.  (*Id.*)  Because the undisclosed evidence was not material, the appellate court held that it was not required to reverse Coats' convictions for prosecutorial misconduct. (*Id.* at 20.)

To prove a *Brady* violation, a petitioner must show that the evidence the prosecutor allegedly suppressed  (1) was exculpatory or impeaching; (2) should have been, but was not produced; and (3) was material to Petitioner's guilt.  *See United States v. Antonakeas*, 255 F.3d 714, 725 (9th Cir. 2001) (citing *Paradis v. Arave*, 130 F.3d 385, 392 (9th Cir. 1997)). Evidence is material " 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' "  *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 685 (1985)).  In assessing materiality, "the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Id.* at 434.

Petitioner has satisfied the first two elements of a *Brady* claim.  The state appellate court found that the evidence regarding Cabbil's criminal history should have been, but was not produced.  The evidence was impeaching, because had it been admitted, it would have tended to prove that Cabbil had falsely testified that there were no outstanding warrants for his arrest.  (*See* Resp't Lodgm't No. 2, Rep.'s Tr. at 250.)  The Court thus must determine whether Petitioner has established that the evidence regarding Cabbil's criminal history was material.

Petitioner objects to the R&R's conclusion that the evidence regarding Cabbil's criminal history was not material.  (*See* Objections to the R&R at 9.)  Specifically, Petitioner argues that the evidence of Cabbil's criminal history was material because "[t]he

testimony of an alleged victim is compelling and persuasive." (*See id.*)  Petitioner further alleges that "[i]f the jury disbelieved Cabbil in all areas of his testimony then that would have had an impact on [P]etitioner's guilt or innocence." (*See id.*)  However, the Court agrees with the R&R and finds that Petitioner has established no reasonable probability that the result of the proceedings would have been different had the prosecutor disclosed Cabbil's criminal history at the trial's outset.  (*See* R&R at 44.)  Despite the prosecution's failure to volunteer information regarding Cabbil's criminal history, Petitioner's counsel was aware of Cabbil's outstanding warrants, and, in fact, cross-examined Cabbil regarding the warrants.[6]  (*See* Resp't Lodgm't No. 2, Rep.'s Tr. at 250.)  Once the evidence of Cabbil's criminal history came to the trial court's attention, the court conducted a thorough analysis and found it was irrelevant to Cabbil's credibility.  (*See id.* at 287-300.)  As a result, the trial court instructed the jury to disregard all questions and answers regarding the possible charges pending against Cabbil.  (*Id.* at 300.)  Because the misdemeanor charges and warrants did not bear on Cabbil's credibility and were inadmissible, Petitioner's counsel could not have used this evidence to impeach Cabbil even if it been disclosed by the prosecution at the trial's outset.  Further, Petitioner has failed to establish that the outcome of the proceedings would have been different had Cabbil been impeached based on his criminal history.  As the R&R points out, there were numerous independent witnesses who corroborated Cabbil's testimony.  (*See* R&R at 44.)  Even if Cabbil had been impeached and the jury chose to disregard his account of the incident, the eyewitnesses' testimony that Petitioner assaulted both victims with the knife would have remained untouched.  Thus, the Court **FINDS** no indication that Petitioner's due process rights were violated by the prosecutor's failure to disclose Cabbil's criminal history.

### B. Petitioner's Claim that the Prosecutor Failed to Disclose the Incentives Cabbil Received in Exchange for His Testimony

Petitioner asserts that the prosecutor violated *Giglio* by failing to disclose an alleged

---

[6] Petitioner's counsel initiated an inquiry into Cabbil's criminal history without first seeking a ruling on admissibility or Cabbil opening the door regarding his criminal past. (*See* Resp't Lodgm't No. 2, Rep.'s Tr. at 250-54.)

deal to dismiss Cabbil's outstanding criminal charges in exchange for his testimony.  (Pet. Mem. at 26.)  Under *Giglio*, " 'the prosecutor has a duty to disclose any promises of leniency made to a witness testifying at trial since any such agreement is relevant to his or her credibility.' "  *See United States v. Ramirez*, 608 F.2d 1261, 1266 (9th Cir. 1979) (quoting *Giglio*, 405 U.S. at 154).  If a petitioner establishes that the prosecutor failed to disclose that a witness was granted leniency, he still cannot show a due process violation unless the evidence of promises of leniency was material.  *See Giglio*, 405 U.S. at 154. Such evidence is material if it "could . . . in any reasonable likelihood have affected the judgment of the jury."  *See id.*  Evidence of promises of leniency is especially likely to be material "when it impugns the testimony of a witness who is critical to the prosecution's case."  *Silva v. Brown*, 416 F.3d 980, 987 (9th Cir. 2005).

In addressing Petitioner's allegation that the prosecutor failed to disclose a deal with Cabbil, the California Court of Appeal first found there was no evidence of favorable treatment by the prosecutor, and that it would be "utter speculation" to find that the dismissal of Cabbil's charges was related to his decision to testify.  (Lodgm't No. 6, *People v. Coats*, No. 036722, slip op. at 20.)  The dismissal of Cabbil's charges occurred four months after Petitioner was sentenced, and Petitioner failed to present any evidence explaining who dismissed the charges or why they were dismissed.  (*Id.*)  Further, the appellate court found that even if Petitioner could show that Cabbil's charges had been dropped in exchange for his testimony, there was no reasonable probability that, had the deal been disclosed, the result of the proceeding would have been different.  (*Id.* at 20-21.) The appellate court found that Petitioner had not shown that the prosecutor's alleged failure to disclose was material because the other eyewitness testimony largely remained unchallenged on appeal.  (*Id.* at 21.)

Here, Petitioner still has failed to produce any direct evidence of an agreement to dismiss Cabbil's charges in exchange for his testimony.  The meager facts Petitioner asserts in support of his *Giglio* claim in the instant Petition are nearly identical to those he asserted in the appellate court proceedings.  Specifically, Petitioner argues that the dismissal of charges against Cabbil after the trial ended is circumstantial evidence that an agreement

existed, and a hearing is necessary to determine whether an agreement was reached before Cabbil testified.  (*See* Traverse at 4.)  However, the mere fact that charges were subsequently dismissed against Cabbil is not sufficient to warrant an evidentiary hearing. *See Ramirez*, 608 F.2d at 1267 (holding that the fact that a witness was allowed to plead to a lesser offense in and of itself is not sufficient to warrant an evidentiary hearing).  Further, this Court agrees with the R&R and finds that even if an agreement existed, Petitioner is unable to show any reasonable likelihood that the alleged failure to disclose the agreement affected the judgment of the jury.  (*See* R&R at 46.)  Unlike other cases in which the Ninth Circuit has held that impeachment evidence was material, the testimony at issue here was not critical to the prosecution's case.  *Cf. Silva*, 416 F.3d at 987 (holding that the prosecution's deal with a witness was material where the witness was the only one to identify the defendant as the killer); *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997) (en banc) (holding that impeachment evidence was material where it pertained to "the prosecution's star witness").  As noted previously, several witnesses testified that Petitioner and co-defendant Bierd were the primary aggressors in the incident and that Petitioner assaulted Cabbil with the knife.  (*See* Resp't Lodgm't 2, Rep.'s Tr. at 325-26 (Johnson), 435-40 (Johnston), 471-74 (Alstrom), 511-14 (Bryant).)  Thus, the Court **FINDS** no indication that Petitioner's due process rights were violated by the prosecution's alleged failure to disclose promises of leniency made to Cabbil.

### *C. Petitioner's Claim that the Prosecutor Willfully Allowed Cabbil to Testify Falsely* [7]

Petitioner asserts that the prosecutor knowingly permitted Cabbil to falsely testify that he had no outstanding warrants.  (*See* Pet. Mem. at 26; Traverse at 3.)  During cross-examination, Petitioner's counsel asked Cabbil whether the Oceanside Police had pursued a warrant that was outstanding against him at the time of the assault.  (*See* Resp't Lodgm't 2, Rep.'s Tr. at 250.)  Cabbil responded, "I don't have no outstanding warrant."  (*Id.*)

---

[7] The R&R does not address Petitioner's claim that the prosecutor committed misconduct by failing to correct Cabbil's false testimony. The Court thus independently examines the merits of this claim.

1    Petitioner claims that the prosecutor offered false testimony because the prosecutor knew

2    that Cabbil had outstanding warrants, yet "willfully failed to correct Cabbil's testimony."

3    (*See* Traverse at 3.)

4           The California Court of Appeal rejected Petitioner's argument that the prosecutor

5    knowingly permitted Cabbil to testify falsely, finding no evidence of deception or other

6    misconduct in the prosecutor's actions.  (*See* Lodgm't No. 6, *People v. Coats*, No. 036722,

7    slip op. at 22.)  Further, the appellate court found that Cabbil's testimony was not material

8    because other witnesses testified as to the events at issue.  (*Id.* at 23.)

9           "A conviction obtained by the knowing use of perjured testimony must be set aside

10   if there is any reasonable likelihood that the false testimony could have affected the

11   outcome of the trial."  *United States v. Polizzi*, 801 F.2d 1543, 1549 (9th Cir. 1986).

12   Although a prosecutor's presentation of false evidence is viewed seriously and its effects

13   must be carefully scrutinized, a new trial is not automatically granted.  *Id.* at 1550.  Rather,

     a finding of "materiality of the evidence" is required.  *Id.*

14          Here, the record does not support Petitioner's contention that the prosecutor

15   knowingly allowed Cabbil to testify falsely.  Cabbil's assertion that he had no outstanding

16   warrants was in response to a question asked by defense counsel, not the prosecutor.  *See*

17   Resp't Lodgm't 2, Rep.'s Tr. at 250.)  Shortly after this exchange, the *prosecutor* requested

18   a sidebar to discuss Cabbil's criminal history.  (*Id.* at 251.)  The next day, the trial court

19   conducted an extensive hearing at which the prosecutor told the court that he ran Cabbil's

20   rap sheet, and it came back blank.  (*Id.* at 270.)  Thus, the record does not indicate that the

21   prosecutor willfully and knowingly permitted Cabbil to testify falsely, nor does it suggest

22   that the prosecutor was complacent once he discovered the apparent failure to adequately

23   investigate Cabbil.  Further, there is no indication that Cabbil's testimony regarding the

24   warrants affected the outcome of the trial.  As noted above, several witnesses corroborated

25   Cabbil's account of the assault.  Thus, the Court **FINDS** no indication that Petitioner's due

26   process rights were violated by the prosecution's alleged use of false testimony.

27   **IV. Ineffective Assistance of Counsel on Direct Appeal**

28          In Claim Four, Petitioner argues that he was denied ineffective assistance of counsel

on direct appeal because his appellate counsel failed to raise the *Brady* issues presented in Claim Three.  Respondent does not address Claim Four, other than to state that the *Brady* issues were, in fact, raised on appeal and that Petitioner's belief that the issues were not raised on appeal is mistaken.  (Answer at 14 n.6.)

Petitioner presented Claim Four to the California Supreme Court in a habeas petition, and the claim was not presented to any other state court.  (Pet. Ex. A at 4, 35-37.)  The petition was summarily denied in an order stating, "Petition for writ of habeas corpus is DENIED."  (Resp't Lodgm't No. 7, *In re Coats*, No. S125582, slip op. (Cal. June 8, 2005).)  Because the state supreme court's order does not provide a rationale on which its decision is founded, the Court must conduct an independent review of the record to determine whether the state supreme court's decision was objectively reasonable.  *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

As noted above, Petitioner alleges that the prosecutor committed *Brady* violations by failing to disclose Cabbil's criminal history, failing to disclose an alleged deal dismissing charges against victim Cabbil in exchange for his testimony, and failing to correct Cabbil's testimony that he had no outstanding warrants.  (*See* Pet. Mem. at 26-29; Attach. to Pet. at 3.)  The state appellate court addressed all of these issues during its adjudication of Petitioner's direct appeal and found that they were without merit.  (*See* Lodgm't No. 6, *People v. Coats*, No. 036722, slip op at 16-23.)  Further, an examination of the brief that Petitioner's counsel filed on direct appeal reveals that counsel did, in fact, argue that the prosecutor committed *Brady* violations by failing to disclose Cabbil's criminal history, failing to disclose the prosecutor's alleged favorable treatment of Cabbil, and allowing Cabbil to testify falsely.  (*See* Resp't Lodgm't No. 3 at 49-52.)  Thus, as Respondent points out, the *Brady* issues were in fact raised on appeal.  Petitioner cannot argue that his appellate counsel was ineffective for failing to raise the *Brady* issues because it is apparent that the California Court of Appeal addressed all of these claims in detail.  Thus, the Court **FINDS** that Petitioner was not denied ineffective assistance of counsel on direct appeal.

**V. Prosecutorial Interference with Petitioner's Right to Call a Material Witness**

In Claim Five, Petitioner argues that he was denied due process by the prosecutor's

interference with his right to call a material witness, co-defendant Bierd.  (*See* Attach. to Pet. at 4; Pet. Mem. at 17, 31-39.)  At trial, Petitioner's counsel advised the court that Bierd would not be a defense witness because Bierd's counsel had advised his client to assert the Fifth Amendment.  (*See* Resp't Lodgm't No. 2, Rep.'s Tr. at 504.)  Petitioner now alleges that Bierd did not testify because "the Prosecutor had extracted an extrajudicial agreement from Bierd that he would not testify for [Petitioner], which Bierd honored out of fear his testimony at [Petitioner's] trial would cost him additional time in state prison custody." (Pet. Mem. at 32.)  In opposition, Respondent argues that Petitioner has not showed that the state appellate court's adjudication of Claim Five was contrary to or involved an unreasonable application of clearly established federal law.  (Answer at 29-36.)

Claim Five was presented to the state supreme court in a petition for review filed on direct appeal.  (Pet. Ex. B at 2-13.)  The state supreme court summarily denied the petition for review in an order stating, "Petition for review DENIED."  (Pet. Ex. C.)  Because the California Supreme Court did not articulate its rationale for denying the petition for review, the Court must look through the state supreme court's summary denial to a lower state court opinion adjudicating Claim Five.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 806 (1991). The Court thus looks to the California Court of Appeal's adjudication of Petitioner's prosecutorial interference claim.

The appellate court reviewed the record of the hearing that the trial court held on Petitioner's motion for a new trial.[8]  (*See* Lodgm't No. 6, *People v. Coats*, No. 036722, slip op. at 10.)  At the new trial hearing, the prosecutor stated that he never entered into a plea agreement with Bierd and never discussed with either Bierd or his counsel whether Bierd would be punished by the court or the prosecutor for testifying on behalf of Petitioner.  (*Id.*) The appellate court thus found no direct evidence of any agreement between the prosecutor and Bierd regarding Bierd's testimony.  (*Id.*)  The appellate court further noted that at the time of his plea, Bierd told the trial court that no promises were made to him to get him to enter into the plea; that no one placed pressure or undue influence on him to enter into it;

---

[8] After being convicted on the assault charges, Petitioner moved for a new trial on the ground that the prosecutor improperly dissuaded Bierd from testifying.

and he entered the plea solely because he thought it was in his best interest to do so.  (*Id.* at 11.)  The appellate court concluded that Bierd's statements gave no indication that the prosecutor had threatened Bierd with increased prison time if he elected to testify.  (*Id.*)

The right to present witnesses to establish a defense is found in the Sixth Amendment's right to compulsory process, and it is also a fundamental aspect of due process of law.  *Washington v. Texas*, 388 U.S. 14, 17-19 (1967).  It is well established that "substantial government interference with a defense witness's free and unhampered choice to testify amounts to a violation of due process."  *Earp v. Stokes*, 423 F.3d 1024, 1036 (9th Cir. 2005).  However, while government interference with a defense witness may be improper, "not all such misconduct rises to the level of a due process violation."  *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 509 (9th Cir. 1994).  To establish a due process violation, Petitioner must make some plausible showing that the testimony at issue "would have been both material and favorable to his defense."  *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982).  Testimony is material "if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact."  *Id.* at 874.

Petitioner's claim of government interference with a defense witness relies chiefly on a declaration by Bierd that was submitted to the trial court in support of Petitioner's motion for a new trial.  In the declaration, Bierd stated,

> It was my understanding that I was facing a sentencing range of 2 to six years and was told that the judge was leaning toward the 0 to 4 year term but that if I testified I would be more likely to get 6 years.  It was my understanding that this was the arrangement my attorneys had agreed to with the district attorney.  My attorney had made assurances to the district attorney during the plea discussions that I would not testify.  I did not believe that this was fair, but thought it was always done this way.

(Resp't Lodgm't No. 1, Clerk's Tr. at 477-78.)  Bierd also described the testimony he would have offered at Petitioner's trial, which was consistent with Petitioner's own trial testimony.  (*Id.* at 478.)

The Court agrees with the R&R and finds that Petitioner has provided no evidence that the prosecutor interfered with Petitioner's right to call Bierd as a witness.  (*See* R&R at 52.)  Bierd's declaration fails to explain the source of his "understanding" that he would

receive a longer sentence if he testified at Petitioner's trial. (*See* Resp't Lodgm't No. 1, Clerk's Tr. at 477-78.) This omission is compounded by the lack of a declaration by Bierd's counsel regarding any agreement with the prosecutor to discourage Bierd from testifying. Further, Bierd's declaration contradicts his sworn statement at his change of plea hearing that there were no promises or threats connected to his plea.

Even if Petitioner could prove witness interference by the prosecutor, he is still required to demonstrate a "reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *See Valenzuela-Bernal*, 458 U.S. at 874. Petitioner objects to the R&R on the grounds that Bierd's testimony was material to Petitioner's case, because Bierd was "the only person" who could testify as to why Petitioner took the knife from Bierd. (*See* Objections to R&R at 9.) However, the Court agrees with the R&R and finds no reasonable likelihood that had Bierd testified, the outcome of the trial would have been different. (*See* R&R at 53.) As a preliminary matter, there is no indication that Bierd would have testified for Petitioner regardless of any prosecutorial interference, because Bierd's counsel had advised him to assert his Fifth Amendment privilege. (*See* Resp't Lodgm't No. 2, Rep.'s Tr. at 504.) Further, had Bierd testified, it is unlikely that his testimony would have been "both material and favorable" to Petitioner's defense. *See Valenzuela-Bernal*, 458 U.S. at 867. Bierd admitted at his change of plea hearing that he had assaulted Cabbil on the basis of his race, and that he had done so in concert with another person. (*See* Resp't Lodgm't No. 2, Rep.'s Tr. at 63-70.) Bierd's testimony on Petitioner's behalf thus could have harmed Petitioner's case, because a jury could have reasonably inferred that Petitioner was the person with whom Bierd assaulted Cabbil. This inference would have been particularly reasonable given the number of witnesses who testified that Petitioner and Bierd were the primary aggressors during the incident. Further, had Bierd testified that Petitioner was not an aggressor in the incident and acted in self-defense, Bierd's credibility would have been undermined by the fact that he admittedly assaulted Cabbil on the basis of race. Thus, the Court **FINDS** that Petitioner was not denied due process by the prosecutor's alleged interference with his right to call a material witness.

## VI. Trial Court's Imposition of Evidentiary Sanctions

At trial, the court sanctioned Petitioner's counsel by excluding evidence of victim Cabbil's misdemeanor charges.  (*See* Resp't Lodgm't No. 2, Rep.'s Tr. at 299-300.)  The trial court issued the sanctions because Petitioner's counsel cross-examined Cabbil regarding the charges without first seeking a ruling on their admissibility.  (*Id.*)  In Claim Six, Petitioner alleges that the trial court violated his right to present evidence and to confront witnesses by imposing the evidentiary sanctions.  (Attach. to Pet. at 4;  Pet. Mem. at 39.)  In opposition, Respondent argues that Claim Six is barred by California's contemporaneous objection rule, a procedural bar to habeas relief.  (Answer at 37.)  Respondent also asserts that Claim Six should be denied because the state appellate court's rejection of the claim is neither contrary to nor an unreasonable application of established federal law.  (*Id.*)

Claim Six was presented to the state supreme court in a petition for review filed on direct appeal.  (Pet. Ex. B at 20-23.)  The state supreme court summarily denied the petition for review in an order stating, "Petition for review DENIED."  (Pet. Ex. C.)  Because the California Supreme Court did not articulate its rationale for denying the petition for review, the Court must look through the state supreme court's summary denial to a lower state court opinion adjudicating Claim Six.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 806 (1991).  The Court will thus look to the California Court of Appeal's adjudication of Claim Six.

### A. Respondent's Assertion that Claim Six is Procedurally Barred

Respondent argues that Claim Six is procedurally barred because Petitioner failed to object to the trial court's exclusion of Cabbil's misdemeanor charges on the ground that the exclusion was an impermissible sanction.  (Answer at 37.)  Petitioner does not address Respondent's argument that Claim Six is procedurally barred.

The California Court of Appeal noted that at trial, Petitioner did not raise any objections on the ground that exclusion of evidence regarding Cabbil's criminal history deprived him of his right to confront and cross-examine witnesses.  (*See* Lodgm't No. 6, *People v. Coats*, No. 036722, slip op. at 24.)  The appellate court acknowledged the general rule that questions relating to admissibility of evidence will not be reviewed on appeal in

1    the absence of a specific and timely objection at trial.  *Id.*  Despite this, the appellate court

2    proceeded to the merits and rejected Petitioner's claim.  *Id.*

3          When "a state prisoner has defaulted his federal claim in state court pursuant to an

4    adequate and independent state procedural rule," federal habeas review is barred.  *Davis v.*

5    *Woodford*, 384 F.3d 628, 654 (9th Cir. 2004).  However, procedural default does not bar

6    consideration of a federal claim on habeas review "unless the last state court rendering a

7    judgment in the case 'clearly and expressly' states that its judgment rests on a state

8    procedural bar."  *Harris v. Reed*, 489 U.S. 255, 263 (1989) (citations omitted).

9          As noted above, the California Court of Appeal denied Claim Six on the merits,

10   rather than holding that the claim was procedurally defaulted.  The state supreme court's

11   summary denial of Claim Six does not indicate whether the state supreme court relied on a

12   procedural bar in denying the claim.  Thus, neither the state appellate court nor the state

13   supreme court "clearly and expressly" stated that its judgment rested on a state procedural

14   bar.  *See Harris*, 489 U.S. at 263.  Accordingly, the Court **FINDS** that Claim Six is not

15   procedurally defaulted.

             **B. Confrontation Clause**

16         Petitioner argues that his right to confront and cross-examine victim Cabbil was

17   violated by the trial court's sanction barring Petitioner from introducing evidence of or

18   asking questions regarding Cabbil's criminal history.  (Pet. Mem. at 39.)  The California

19   Court of Appeal held that the trial court properly excluded the evidence under Section 352

20   of the California Evidence Code.  (*See* Lodgm't No. 6, *People v. Coats*, No. 036722, slip

21   op. at 24.)  The appellate court found that given the marginal relevance of the charges and

22   their remoteness, Petitioner failed to show the evidence would have produced a

23   significantly different impression of Cabbil's credibility had it been admitted.  (*Id.* at 24-

24   25.)  The appellate court also found that even if the trial court's exclusion of the evidence

25   resulted in constitutional error, such error was harmless given the independent evidence of

26   Petitioner's guilt.  (*Id.* at 25.)

27         "A limitation on cross-examination 'does not violate the Confrontation Clause

28   unless it limits relevant testimony and prejudices the defendant, and denies the jury

sufficient information to appraise the biases and motivations of the witness.' " *United States v. Holler*, 411 F.3d 1061, 1066 (9th Cir. 2005) (quoting *United States v. Bensimon*, 172 F.3d 1121, 1128 (9th Cir. 1999)).  If a petitioner demonstrates a Confrontation Clause violation, it is subject to harmless error review.  *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).  Whether such a violation is harmless depends on a variety of factors, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.*

Petitioner has failed to demonstrate that the trial court's restriction on Petitioner's cross-examination of Cabbil limited relevant testimony or denied the jury sufficient information to appraise Cabbil's biases and motivations.  *See Holler*, 411 F.3d at 1066.  As the trial court noted, the relevance of Cabbil's misdemeanor charges was limited because none of the charges involved crimes of moral turpitude.[9]  (*See* Resp't Lodgm't No. 2, Rep.'s Tr. at 290.)  The relevance of the charges was further limited because they were remote in time, with the most recent charge dating to 1996.  (*See* Lodgm't No. 6, *People v. Coats*, No. 036722, slip op. at 24-25.)  Even if the trial court erred in refusing to allow Petitioner's counsel to cross-examine Cabbil regarding the charges, such error was harmless.  Several witnesses corroborated Cabbil's account of the incident, Petitioner was otherwise permitted to extensively cross-examine Cabbil, and the prosecution's overall case against Petitioner was strong.  Thus, the Court **FINDS** that Petitioner has failed to establish a Confrontation Clause violation.

## VII. Dismissal of the State Attorney General as an Individual Respondent

In his Petition, Petitioner names both Warden William Sullivan and California

---

[9] As noted above, Cabbil's criminal history consisted of (1) an active misdemeanor bench warrant issued in 1996 for failing to appear on citations for driving on a suspended license and driving without taillights; (2) two 1991 failure to appear warrants on charges for driving with a suspended license and insufficient headlights; and (3) pending charges of misdemeanor driving under the influence and driving without liability insurance.

Attorney General Bill Lockyer as respondents.  (Pet. Mem. at 1.)  Respondent requests the Court to dismiss the Attorney General as a respondent because he is not a custodian of the Petitioner.  (Answer at 1.)

A petitioner for habeas corpus relief "must name the state officer having custody of him or her as the respondent to the petition."  *Stanley v. California Supreme Ct.*, 21 F.3d 359, 360 (9th Cir. 1994) (citing Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts).  Ordinarily, this person is the warden of the facility in which the petitioner is incarcerated.  *Brittingham v. United States*, 982 F.2d 378, 379 (9th Cir. 1992).  The Attorney General is not a custodian of Petitioner and is not otherwise a proper respondent within the meaning of the Rules Governing Section 2254 Cases.  The Court thus **DISMISSES** the Attorney General as an individual respondent in this matter.

### Conclusion

For the reasons set forth above, the Court (1) **ADOPTS** the R&R; (2) **DENIES** the Petition in its entirety; and (3) **DISMISSES** the Attorney General as an individual respondent in this matter.

**IT IS SO ORDERED.**

DATED:  December 12, 2006

_____
HON. NAPOLEON A. JONES, JR.
United States District Judge

cc:    Magistrate Judge Peter C. Lewis
       All Parties